IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION FILE NO.: 4:09-CV-00031-D

ELIZABETH S. PETTET, DIANE L. )
KATZENBERGER, and LYNWOOD H. )
KEITH, JR., individually and on behalf of )
all others similarly situated, )
                Plaintiffs )
                 )
v. )
                 )
STATE FARM FIRE AND CASUALTY )
COMPANY, )
                Defendant )
                 )

PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to Fed. R. Civ. P. 23(e), Plaintiffs Elizabeth S. Pettet ("Pettet"), Diane L. Katzenberger ("Katzenberger"), and Lynwood H. Keith, Jr. ("Keith")(collectively "Plaintiffs") submit this Memorandum in Support of the parties' Joint Motion for Preliminary Approval of Class Action Settlement, respectfully showing the Court the following:[1]

## STATEMENT OF FACTS

### A.    Background of the Case

This case was originally filed on February 25, 2009 [Doc. 1], as a proposed class action on behalf of all North Carolina policyholders who are currently or who have been insured under homeowners policies issued by Defendant State Farm Fire and Casualty Company ("State

---

[1]Defendant State Farm Fire and Casualty Company ("State Farm") is submitting its own Memorandum in Support of the Joint Motion for Preliminary Approval of Class Action Settlement. While State Farm joins in the Joint Motion and consents to entry of the Consent Order attached to it, State Farm does not join in this Memorandum.

Farm") during the three (3) years preceding the filing of Plaintiffs' Complaint. Plaintiffs further asserted allegations against State Farm on behalf of a nationwide class of State Farm policyholders. Plaintiffs later filed an Amended and Recast Complaint on July 16, 2009 [Doc. 17], making substantially the same allegations as those in the original Complaint.

Plaintiffs' claims, and those of the putative class, arise out of State Farm's calculation of premiums for insurance policies, and specifically its use and application of Public Protection Class Codes ("PPC Codes") which are maintained and distributed by the Insurance Services Office, Inc. ("ISO"). The ISO is a nationwide organization that, since 1971, has supplied data, analytics, and decision support services for a variety of industries, including the insurance industry. As part of its work, the ISO identifies and publishes PPC Codes for areas located throughout North Carolina. (*See generally* Pls.' Am. & Recast Compl. [Doc. 17] ¶¶ 14-18.)

The PPC Codes distributed by the ISO are based upon the availability of and/or proximity to fire protection services, such as fire stations and fire hydrants, for a particular area, and are measured on a scale of 1 to 10. A PPC Code of "1" is the best available classification and would reflect superior fire protection service for a particular property. Conversely, a PPC Code of "10" is the worst available classification. In some cases, PPC Codes may be split where there are two or more classifications (i.e., "6/9") depending on the proximity of the particular property to a fire station or hydrant. Because city and county services change over time, PPC Codes likewise change as fire stations or hydrants are located near houses or structures. For example, if a particular property is rated in a fire protection class of "10," but a fire station is built a mile from the property, the PPC Code for that property would be lowered. The ISO regularly publishes updates to its PPC Codes throughout the State of North Carolina. (*Id.* ¶¶ 18-22.)

When a prospective customer initially applies for insurance coverage, State Farm calculates the premium due for the coverage. As part of that process, State Farm utilizes the ISO PPC Code for the property. If a particular property has a higher ISO PPC Code, the insurance premium for that property will generally be higher than a similar property with a lower ISO PPC Code. For example, if a customer sought $100,000 in coverage for frame construction, and the ISO PPC Code for the property was "10," the premium might be $1,000. If the PPC Code was "1" - "6," the premium might be $400. In many cases, the PPC Code assigned to a policy will have a direct effect on the premiums the policyholder is charged for the policy. (*Id.* ¶¶ 26-30.)[2]

State Farm's application of PPC Codes likewise takes place upon the renewal of its policies. In the declarations pages issued to its policyholders, State Farm provides itself with an "Automatic Renewal" option. Pursuant to this provision, State Farm calculates the premiums due on policies at the time of renewal and then bills the customer the amount so calculated. This process should take into account any updates in PPC Codes distributed by the ISO. For example, if at the time of issuance of the original policy, a homeowner's PPC Code was "10," but at the time of renewal, the PPC Code was "1," State Farm should calculate the premium for the policy with the correct, lower PPC Code. (*Id.* ¶¶ 38-48.)

**B.**     **Allegations of the Plaintiffs and Discovery Conducted**

In Plaintiffs' original Complaint [Doc. 1] and their Amended and Recast Complaint [Doc. 17], Plaintiffs alleged that State Farm was uniformly not correctly applying PPC Codes when coverage was initiated or renewed under its policies. Specifically, Plaintiffs alleged that when

---

[2]This is not always the case. In discovery, Plaintiffs learned that State Farm utilizes "banding" in its calculation of premiums such that in some cases the premium for a policy would remain the same even if the PPC Code was higher than it otherwise should be.

policies of insurance were initiated or renewed with State Farm, it was applying higher PPC

Codes than were correct for the particular property, and was therefore charging and collecting

from North Carolina consumers more than the proper amount for insurance coverage.  Plaintiffs

brought breach of contract claims and sought recovery of compensatory damages, interest, and

attorneys' fees and expenses.  (*Id.* ¶¶ 108-135.)

In addition to their individual claims, Plaintiffs further sought certification of two

separate classes, to wit:

(1)     The North Carolina Class

All persons residing in the State of North Carolina who, from three (3) years prior to the filing of this action to the date of final judgment in this action, have initiated and/or renewed policies of homeowner's insurance with State Farm, and whose policies of insurance were initiated and/or renewed by State Farm at a premium based in any part on an ISO fire protection class that was higher than the actual ISO fire protection class on the insured property at the time coverage was initiated and/or renewed. Excluded from the class definition are:  (a) All judicial officers in the United States and their families through the third degree of relationship; (b) State Farm and any of its officers, directors, employees,  and agents, and any persons or entities who have already settled or otherwise compromised their claims against State Farm; (c) Any person who has filed before final judgment any bankruptcy proceeding; and (d) Anyone who has pending against State Farm on the date of the Court's class certification order any individual action wherein the recovery sought is based in whole or in part on the type of claims asserted herein.

(2)     The Nationwide Class

All persons residing in the United States who, from the date of commencement of the applicable state statute of limitations for the claims asserted herein (between 3 – 15 years) to the date of final judgment in this action, have initiated and/or renewed policies of homeowner's insurance with State Farm, and whose policies of insurance were initiated and/or renewed by State Farm at a premium based in any part on an ISO fire protection class that was higher than the actual ISO fire protection class on the insured property at the time coverage was initiated and/or renewed. Excluded from the class definition are:  (a) All judicial officers in the

United States and their families through the third degree of relationship; (b) State Farm and any of its officers, directors, employees, and agents, and any persons or entities who have already settled or otherwise compromised their claims against State Farm; (c) Any person who has filed before final judgment any bankruptcy proceeding; and (d) Anyone who has pending against State Farm on the date of the Court's class certification order any individual action wherein the recovery sought is based in whole or in part on the type of claims asserted herein.

(*Id.* ¶¶ 86, 96.)

State Farm answered Plaintiffs' original Complaint on April 14, 2009 [Doc. 6] and answered Plaintiffs' Amended and Recast Complaint on August 7, 2009 [Doc. 18]. In each Answer, State Farm denied all material allegations of the Complaint, and specifically denied the propriety of class certification on a litigated basis. (*See generally* Docs. 6, 18.)

The parties promptly began formal discovery. Plaintiffs' initial goal in discovery was to determine the proper scope of this action, *i.e.*, whether State Farm was correctly applying PPC Codes in North Carolina and throughout the United States. Plaintiffs served interrogatories and requests for production on State Farm. State Farm responded to Plaintiffs' discovery requests and produced over thirty thousand pages of documents. Plaintiffs' Counsel reviewed the voluminous production and met with consultants. Plaintiffs' Counsel learned that State Farm only utilizes PPC Codes in six states (including North Carolina), but with respect to those six states, certain variations existed as to the codes utilized by State Farm and State Farm's application of them. With respect to any other states, State Farm utilizes a different rating system known as "sub-zone rating factors" which do not in any way utilize PPC Codes.

The parties also engaged in informal discovery. State Farm's counsel have from the outset been willing to provide information to assist Plaintiffs in their discovery efforts as to the appropriate scope of this case. Numerous telephone conferences and meetings have been held

among counsel relating to State Farm's business practices throughout North Carolina and the United States, and how its business practices in North Carolina differ from the rest of the country. State Farm provided Plaintiffs' Counsel with two Affidavits of Kathy Popejoy confirming these discussions. Plaintiffs' Counsel likewise reviewed thousands of pages of documents relating to State Farm's application of PPC Codes in North Carolina and its failure to correctly apply and update those codes. Based on the formal and informal discovery conducted by the parties, Plaintiffs' Counsel have agreed that only a North Carolina class could properly be certified in this case and that this case should therefore be limited to North Carolina.[3]

**C.**     **Settlement Negotiations and Benefits of the Settlement**

In late November 2009, counsel for State Farm contacted Plaintiffs' Counsel to inquire about the prospect of settling the claims of North Carolina policyholders. An initial conference among counsel took place on December 18, 2009. Since that time, over eight in-person meetings have taken place, along with countless telephone conferences and e-mails. Through the course of this process, the parties have voluntarily exchanged information and documents relating to State Farm's business practices in North Carolina and how its potential incorrect application of PPC ratings could be remedied. Plaintiffs' Counsel have also performed confirmatory discovery through in-person interviews of State Farm personnel relating to State Farm's business practices and the scope and terms of a potential settlement.

After engaging in this months long process, the parties have now reached a Settlement Agreement (the "Settlement" or the "Agreement"), subject to the Court's approval. The terms

---

[3]Plaintiffs have herewith submitted a Consent Motion to Amend their Complaint along with a proposed Second Amended Complaint in which Plaintiffs withdraw all allegations relating to certification of a nationwide class.

and scope of the Settlement Agreement were discussed with the Court in the Status Conference held on May 10, 2010. Under the terms of the Agreement, the parties have agreed to certification of the following Class (the "Class" or the "Class Members"):

> All persons who, during the Class Period [the time period of February 25, 2005 through the date of this Court's preliminary approval of the Settlement Agreement between the parties], were insured by a State Farm Homeowners or PPC Commercial insurance policy covering a home, dwelling, or other structure, or personal property within the State of North Carolina.

> Excluded from the Settlement Class are (a) all judicial officers in the United States and their families through the third degree of relationship; and (b) all officers, directors, employees or counsel of State Farm.[4]

The Settlement provides broad relief to the Class Members. The centerpiece of the Settlement is State Farm's agreement to purchase and implement a propriety computer database known as ISO Location®. The ISO Location® computer database is a computer database marketed and sold by the ISO which, when integrated into an insurer's computer system, provides the insurer with accurate, up to date PPC Codes. Integration and use of the ISO Location® database will provide all Class Members who are current policyholders with going forward relief in the form of a check of their PPC Code every year at the time of renewal so as to ensure that their premiums are being properly calculated. As a material term of the Settlement, State Farm has agreed to continue this check for a period of three years following integration of

---

[4]The parties have herewith submitted a Stipulation and Agreement of Settlement which fully defines the Class and the benefits accruing to the Class.

the ISO Location database. (*See* Stipulation & Agreement of Settlement ¶¶ 9, 10.) The remaining terms of the Settlement can be summarized as follows.[5]

      1.    <u>Current Policyholders</u>

With respect to current policyholders, the Agreement requires State Farm to conduct a statewide audit commencing ten (10) days following integration of the ISO Location® system. The statewide audit will entail State Farm running the address of each of its policyholders through the ISO Location® database to determine whether the PPC Code maintained by State Farm in its underwriting system matches the PPC Code in the ISO Location® database. State Farm will then update its records to reflect the correct PPC Code. In the event the ISO Location database returns a "split zone" (i.e. "6/9"), State Farm will use commercially appropriate means to conduct a manual review to determine the correct PPC Code and apply it going forward. State Farm believes the automated use of the database will in most cases allow it to correct the PPC Codes, and has committed to complete the automated process within ninety (90) days following integration of the database. In any event, the entire audit process shall be completed no more than one year following integration of the database. (*See generally id.* ¶ 10.)[6]

---

[5]Use of ISO Location® for purposes of tracking and updating PPC Codes has been approved by the North Carolina Department of Insurance. Further, because this case is governed by the Class Action Fairness Act of 2005 ("CAFA"), notice of the Settlement and its terms will be provided to the North Carolina Insurance Commissioner, who will have the opportunity to raise any concerns about the Settlement with the Court. *See* 28 U.S.C. § 1715(a)(1)(B). Because the use of the ISO Location® database has already been approved, the parties do not anticipate any such concerns.

[6]The software will be used by State Farm for both Homeowners and PPC Commercial insurance policies in North Carolina (as defined in the Stipulation and Agreement of Settlement) going forward and in determining the relief due to Eligible Claimants as set forth herein. In Plaintiffs' original Complaint, commercial policies were not included. During settlement negotiations, and

With respect to any policyholders whose PPC Code as reflected in the ISO Location®
database are lower than the PPC Code maintained by State Farm in its underwriting system, State
Farm will maintain a database of such persons.  State Farm will then utilize its underwriting
system to determine whether the change in PPC Code would have had any effect on the
policyholder's premiums during the Class Period.  If the change in PPC Code would have
resulted in the policyholder paying a higher premium during the Class Period, State Farm will
not seek to collect any additional premium for coverage during the Class Period.  If the change in
PPC Code would have resulted in the policyholder paying a lower premium during the Class
Period, State Farm will identify each such person as an Eligible Claimant.  (*Id.*)

2.      Former Policyholders

With respect to former policyholders, the Agreement requires State Farm to conduct a
statewide audit commencing ten (10) days following integration of the ISO Location® system.
The statewide audit will entail State Farm running the addresses of each of its former
policyholders through the ISO Location® database to determine whether the PPC Code last
maintained by State Farm in its underwriting system matches the PPC Code in the ISO
Location® database.  Just as with current policyholders, if State Farm is unable to determine the
applicable PPC Code through automated means, it will undertake a manual review to determine
the correct PPC Code.  With respect to any policyholders whose PPC Code as reflected in the
ISO Location® database are lower than the PPC Code last maintained by State Farm in its
underwriting system, State Farm will maintain a database of such persons.  State Farm will then
utilize its underwriting system to determine whether the change in PPC Code would have had

based upon formal and informal discovery, Plaintiffs' Counsel insisted that commercial policies
also be included in the Settlement.

any effect on the policyholder's premiums during the Class Period. If the change in PPC Code would have resulted in the policyholder paying a higher premium during the Class Period, State Farm will <u>not</u> seek to collect any additional premium for coverage during the Class Period. If the change in PPC Code would have resulted in the policyholder paying a lower premium during the Class Period, State Farm will identify each such person as an Eligible Claimant. (*Id.* ¶ 11.)

      3.     <u>Payment of Eligible Claimants</u>

Within sixty (60) days following State Farm's identification of a current or former policyholder as an Eligible Claimant, State Farm will calculate the amount of the refund due to the policyholder through use of the its underwriting system. The refund amount to be paid to the policyholder shall be an amount equal to the premium difference from (a) the beginning of the first policy period during which application of the PPC Code in the ISO Location® database would have resulted in lower premiums (*see* Sections 10.1 to 10.3) or (b) February 25, 2005, whichever is later, to the beginning of the first policy period when the application of the PPC Code in the ISO Location® database would no longer have resulted in lower premiums (*see* Stipulation and Agreement of Settlement, section 12.1). State Farm will then calculate the premium difference for the period in which the PPC Code differed. The refund amount due to the policyholder will be equal to the premium difference from (a) the date on which the PPC Code identified by the ISO Location® database first differed from the PPC Code maintained by State Farm, or (b) February 25, 2005, whichever is later to (c) the date on which the refund check or draft is issued to the Eligible Claimant, or (d) the date (if any) when those two PPC Codes ceased to differ, whichever is earlier. These refunds will be increased by simple interest calculated for the time period in which the PPC Code identified by the ISO Location® database

first differed from the PPC Code maintained in State Farm's underwriting system until the appropriate ending date. (*Id.* ¶ 12.)

A settlement fund will be established to ensure the payment of claims of all Eligible Claimants. The fund will initially be in the amount of $30,000,000. To ensure that all of the claims of Eligible Claimants are paid, State Farm has further agreed that the settlement fund will never drop below the sum of $1,000,000. In the event that it does so, State Farm has agreed that it will contribute additional amounts to the fund in increments of $250,000 each so that all Eligible Claimants are paid the full amount due to them. (*Id.* ¶¶ 8.1, 8.2.)

4. <u>Monitoring by Plaintiffs' Counsel</u>

Because implementation of the statewide audit will take some time, Plaintiffs' Counsel will monitor State Farm's compliance with the terms of the Settlement and the methodology used to identify Eligible Claimants, calculate refunds and interest, and issue refunds. State Farm has agreed to provide Plaintiffs' Counsel with reports at regular intervals during the audit process identifying, among other things: (a) the number of policyholders who have been audited; (b) the number of PPC Codes that have been changed; (c) the number of potential Eligible Claimants; (d) the number of Eligible Claimants; and (e) the amounts of refunds and interest paid to Eligible Claimants. If questions arise, Plaintiffs' Counsel will raise and resolve those issues with State Farm, without the need of Court intervention. (*Id.* ¶ 13.)

5. <u>Notice and Administration</u>

The Settlement also contemplates notice and settlement administration for the Class Members. State Farm has agreed to contract with a third party settlement administrator (the "Administrator") for purposes of administering the Settlement. Within a reasonable time after

preliminary approval of the Settlement, State Farm has agreed to provide the Administrator with a list of all potential Class Members along with the most current address for them in State Farm's computer records. The Administrator will then mail notice to the best known address of all Class Members, notifying them of the terms of the Settlement, their right to exclude themselves from the Settlement, and their right to appear at a Fairness Hearing to be set by the Court. Prior to the Fairness Hearing, the Administrator will file with the Court a report detailing the efforts undertaken to provide notice to the Class. State Farm has agreed to pay all costs associated with notice and administration. (*Id.* ¶¶ 5, 13.)

### 6. Attorneys' Fees and Expenses

Finally, the Settlement calls for State Farm to pay the attorneys' fees and expenses of counsel for the Class out of the Settlement Fund in two separate installments: (a) a sum no greater than $5,000,000 to be paid within ten (10) business days after final approval of the Settlement; and (b) a sum equal to 20% of the additional amounts, if any, State Farm ultimately contributes to the Settlement Fund in the event the initial Settlement Fund is depleted. Because the terms of the Settlement ensure that all Class Members will receive 100% reimbursement of any overcharge to them, plus interest, the payment of attorney's fees and expenses will not in any way reduce or otherwise affect the payments to Class Members. (*Id.* ¶ 15.)[7]

---

[7]The initial $5,000,000 attorneys' fee and expense payment represents approximately 17% of the Settlement Fund. Any additional payment of attorneys' fees and expenses will likewise be a percentage of additional amounts State Farm contributes to the Settlement Fund. An award of attorneys' fees and expenses as a percentage of a common fund is an appropriate means for compensating counsel representing a class. *See, e.g.*, *Deloach v. Philip Morris Cos.*, No. 1:00CV01235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) ("The percentage method awards some fraction of the total recovery as an attorneys' fee, and is generally used in cases in which a common fund is created."); *Teague v. Bakker*, 213 F. Supp. 2d 571, 583 (W.D.N.C. 2002) (quoting *McKnight v. Circuit City Stores, Inc.*, 14 F. Appx. 147, 149 (4th Cir. 2001)) ("In

## ARGUMENT AND CITATION OF AUTHORITY

Public and judicial policy strongly favor the pretrial settlement of class action lawsuits. *In re Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *accord Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). In order to approve a class action settlement, this Court must make three separate findings. First, the Court must find that the Settlement Class proposed by the parties meets the requirements of Fed. R. Civ. P. 23. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997). Second, the Court must find that the Settlement is "fair, adequate and reasonable, and is not the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *see also* Fed. R. Civ. P. 23(e)(1)(C). Finally, the Court must find that the notice to the class meets the requirements of Federal Rule 23 and satisfies due process concerns. *See, e.g.*, Fed. R. Civ. P. 23(c)(2)(B); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13, 105 S.Ct. 2965 (1985). All of these prerequisites are satisfied here.

### A.      The Settlement Class Should Be Certified.

To be certified as a class action under Fed. R. Civ. P. 23, an action must meet the requirements of both subsections (a) and (b) of Rule 23. *Haywood v. Barnes*, 109 F.R.D. 568, 575 (E.D.N.C. 1986). Rule 23(a) requires that a defined class exist and that the proposed class representatives be members of the putative class. *Id.* at 576; *see also East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) ("a class representative must be part of the class"). In addition, the four prerequisites expressly set out in Rule 23(a) must be satisfied, to wit: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative

---

the Fourth Circuit, 'the most critical factor in calculating a reasonable fee award is the degree of success obtained....'").

parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a); *Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-CV-00400-BR, 2009 WL 2208131, at *5 (E.D.N.C. July 22, 2009). These factors are commonly referred to as numerosity, commonality, typicality, and adequacy.[8]

If the prerequisites under Rule 23(a) are met, the action must then satisfy one of the three alternative sets of requirements under Rule 23(b). Here, the Class proposed by the parties satisfies the requirements of Rule 23(b)(3) in that (1) the questions of law or fact common to the Class Members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Indeed, the Class proposed by the parties for settlement purposes is the most eminently fair and efficient way to dispose of this litigation. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (explaining that the central purpose of class actions is to promote judicial economy and efficiency).

1. Numerosity

Numerosity requires that a class be so large that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Fourth Circuit has held that "[t]here is no mechanical test for determining whether in a particular case the requirement of numerosity has been satisfied." *Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35 (4th Cir. 1978); *see also Cox v.*

---

[8]There is no question here that a defined class exists. *See Haywood*, 109 F.R.D. at 576. The Class consists of all persons who insured a home, building, or other structure in North Carolina with State Farm from February 25, 2005 to the date of this Court's preliminary approval of the Settlement. These persons are readily identifiable through business records maintained by State Farm.

*Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *see also Martinez v. Mecca Farms*, 213 F.R.D. 601, 605 (S.D. Fla. 2002) ("Generally, a class should have no fewer than 21 members, and will generally satisfy the numerosity requirement if it has more than 40."). Rather, numerosity must be "resolved in the light of the facts and circumstances of the particular case." *Kelley*, 584 F.2d at 35. The numerosity requirement is not seriously in question here. State Farm has disclosed for purposes of settlement that it has more than 460,000 current policyholders in North Carolina. The Settlement will likewise include former policyholders who are still being compiled by State Farm. Clearly, the numerosity requirement is met in this case.

      2.    <u>Commonality</u>

      To meet the commonality requirement of Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Rule, however, "does not require that all, or even most issues be common, nor that common issues predominate, but only that common issues exist." *Cent. Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1992). The commonality requirement is liberally construed and is satisfied when the claims of the prospective class present common questions of law or fact. *See Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 521 (M.D. Ala. 1992). Common questions are those that arise from a common nucleus of operative fact. *Haywood*, 109 F.R.D. at 577. "Rule 23 is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (3rd Cir. 1995); *see also Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003) ("Commonality requires that there is at least one issue affecting all or a significant number of proposed class members").

Claims arising out of a common course of conduct and out of standard documents are classic examples of claims proper for class treatment. *See Haroco, Inc. v. Am. Nat'l Bank & Trust Co.*, 121 F.R.D. 664, 669 (N.D. Ill. 1992); *Ditty v. Check Rite, Ltd.*, 182 F.R.D. 639, 642 (D. Utah 1998). This action fits that description. The named Plaintiffs and all members of the Class have maintained substantially similar policies of insurance with State Farm. The named Plaintiffs and all members of the Class have paid premiums to State Farm, and their premiums have all been calculated through State Farm's use of PPC Codes. Some of them have been overcharged due to State Farm's incorrect application of PPC Codes, thus leading to the breach of contract claims set forth in Plaintiffs' Complaint. All of these incorrect applications of PPC Codes will be remedied through the Settlement. The claims of the named Plaintiffs and the putative class present common questions of law and fact.

3. <u>Typicality</u>

Typicality is satisfied where the named plaintiffs' claims are sufficiently similar to those of the absent class members to allow the conclusion that the representatives will protect the interests of the class they represent and that there are no antagonistic interests between the representatives and the proposed class. *See Coleman*, 141 F.R.D. at 522. "[W]hile the commonality requirement focuses on the claims of the class as a whole, the typicality requirement focuses on the named plaintiff's claim." *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 64 (M.D.N.C. 2008) (citations omitted). The named plaintiff's "interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006); *see also Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1020-23 (11th Cir. 1996)(finding that typicality exists when a

plaintiff's injury arises from or is directly related to a wrong to a class, and that classwide wrong includes the wrong to the plaintiff).

The Eighth Circuit explained the typicality requirement succinctly:

> Typicality under Rule 23(a)(3) means that there are 'other members of the class who have the same or similar grievances as the plaintiff.' [Cits.] The burden is 'fairly easily met so long as other class members have claims similar to the named plaintiff.' *DeBoer*, 64 F.3d at 1174. Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory.

*Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996*); see also Amchem Prods., Inc.*, 521 U.S. at 626 n.20 (commonality, typicality and adequacy tend to merge and "serve as guideposts for determining whether…maintenance of a class action is economical, and whether the named plaintiff's claim[s] and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence") (alternations in original) (internal quotation marks and citation omitted).

The claims of named Plaintiffs arise from the same common course of conduct as do the claims of each of the Class Members, and they are all based on the same legal theories. The named Plaintiffs' and each Class Member's claims arise due to State Farm's failure to accurately apply PPC Codes to policies so as to ensure that policyholders paid the correct premium during the Class Period. Because of State Farm's failure to accurately apply the PPC Codes, the named Plaintiffs, on behalf of the Class Members, filed an action for breach of contract against State Farm. Those claims are all being resolved in the Settlement with the named Plaintiffs and each Class Member being eligible to receive a full refund, plus interest.

The interests of the named Plaintiffs are therefore perfectly aligned with the Class Members. The named Plaintiffs present the same grievances as all other Class Members and they seek the same relief under the same legal theories. "Since all plaintiffs must establish the same basic elements to prevail and since there are no differences as to the type of relief sought or the theories of liability upon which plaintiff is proceeding, the typicality requirement is met." *Davis v. Northside Realty Assocs., Inc.*, 95 F.R.D. 39, 43 (N.D. Ga. 1982).

    4.   <u>Adequacy Of Representation</u>

Adequacy of representation merges with commonality and typicality to guide the Court in determining whether maintenance of the action as a class action is economical and whether the interests of the absent class members will be fairly and adequately protected. *See Amchem Prods.*, 521 U.S. at 626 n.20. The adequacy requirement also examines the adequacy of class counsel and the existence of any conflicts of interest. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982*); see also Olvera-Morales v. Int'l Labor Mgmt. Corp.*, 246 F.R.D. 250, 258 (M.D.N.C. 2007). In *Buford v. H&R Block*, 168 F.R.D., 340, 350 (S.D.Ga. 1996), *aff'd.*, 117 F.3d 1433 (11th Cir. 1997), the court expanded on these considerations:

> Courts traditionally hold that, in order to satisfy this requirement, it is necessary to determine: (1) that the plaintiff's attorney is qualified, experienced and will competently and vigorously prosecute the suit, and; (2) that the interest of the class representative is not antagonistic to or in conflict with other members of the class.

*Buford*, 168 F.R.D. at 351 (citations omitted).

The Class is represented by Pope, McGlamry, Kilpatrick, Morrison & Norwood, LLP ("Pope McGlamry") and Ward and Smith. P.A. ("Ward and Smith"). The ability and reputation of Ward and Smith is well known to this Court. They have been involved in numerous

commercial and class action cases throughout North Carolina. Pope McGlamry will serve as lead counsel for the Class. While this is Pope McGlamry's first appearance in this Court, Pope McGlamry has been involved in numerous cases properly described as complex litigation, has been determined to be adequate class counsel in numerous cases, and has successfully represented Plaintiffs in numerous class action cases. *See, e.g.*, *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 325, 331 (D.S.C. 1991) ("[C]ourts generally hold that the employment of competent counsel assures vigorous prosecution.").[9]

Just as Class Counsel adequately represent the Settlement Class, so do the named Plaintiffs. The named Plaintiffs have been and are capable of continuing to be active participants in both the prosecution of, and the negotiations to settle, this action. As set forth above in the discussion concerning commonality and typicality, the named Plaintiffs' claims arise from the same course of conduct as the claims of the Class Members. Thus, their claims are similarly related so as to assure that they will fairly and adequately protect the interests of the remaining Class Members. The named Plaintiffs' interests are so consistent with those of the Class that there are no conflicts between or among the named Plaintiffs and any of the Class Members.

Moreover, the named Plaintiffs do not seek relief different from or greater than that of other Class Members. *See, e.g.*, *Duhaine v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 64 (D. Mass. 1997) ("[U]nlike the class in *Amchem*, in which there were conflicts between class members with present injuries and class members with possible future injuries, here all class members are alleged to have been injured during the same period of time."). Like the other

_____
[9]A list of some of the class action and complex litigation cases in which Pope McGlamry has been involved is set forth in the Affidavit of Michael L. McGlamry which is attached to this Memorandum as Exhibit "1."

Class Members, the named Plaintiffs were wronged when State Farm incorrectly applied a PPC Code to their insurance policies and therefore overcharged them for their insurance. The Settlement proposed here allows each Class Member to receive a full refund of the overcharge, plus interest. The named Plaintiffs' claims will be handled no differently. Consequently, the named Plaintiffs adequately represent the interests of the entire Settlement Class.[10]

     5.     <u>Predominance And Superiority</u>

In addition to satisfying the requirements of numerosity, commonality, typicality, and adequacy of representation, parties seeking class certification pursuant to Fed. R. Civ. P. 23(b)(3) must also show that prosecution of the class action would be convenient and desirable. *See Amchem Prods., Inc.*, 521 U.S. at 615. "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id.* at 615 (citations omitted).

The predominance inquiry requires the Court to determine whether the class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623. That is clearly the case here as there are no disparate questions undermining class cohesion. The Class Members have been harmed by an insurer's common course of conduct of incorrectly applying PPC Codes and thereby overcharging policyholders. The Class Members are readily identifiable, and they all suffered harms at the same time, i.e., when they were

---

[10]The named Plaintiffs do seek incentive awards for bringing and prosecuting this action, but that compensates them for their time and effort on behalf of the Class. The named Plaintiffs do not seek relief under the Settlement that is not available to other Class Members.

overcharged for their insurance because State Farm incorrectly calculated their PPC Code. These allegations unite the class, making it economical to litigate the claims in one suit. *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975), *cert. denied*, 449 U.S. 816 (1976); *see also In re: Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 511-12 (D.N.J. 1997), *aff'd.*, 148 F.3d 283 (3rd Cir. 1998) ("[A]lthough class members purchased their policies individually, Prudential allegedly induced them to do so through sales presentations containing standardized, coordinated, and uniformly deceptive representations and omissions.").

The conduct here presents common issues concerning standardized, coordinated, and uniform procedures State Farm has utilized with regard to its North Carolina policyholders. These common issues are central issues uniting the class and predominate over any individual ones. "Predominance is a test readily met in certain cases alleging consumer or securities fraud . . ." *Amchem Prods., Inc.*, 521 U.S. at 625. "This case, involving a common scheme to defraud millions of [] insurance policyholders, falls within that category." *In re: Prudential*, 148 F.3d at 315*; see also In re Polyester Staple Antitrust Litig.*, MDL No. 3:03CV1516, 2007 WL 2111380, at *27 (W.D.N.C. July 19, 2007) (holding that the predominance requirement was met where most of the evidence plaintiffs intended to present at trial was common to each member of the putative class).

The same is true with respect to the superiority inquiry. In this regard, courts seek to determine whether a single resolution of the claims of class members is superior to individual litigation of the claims. *See In re: Prudential*, 962 F. Supp. at 523. It requires the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543

F.3d 141, 149 (3rd Cir. 2008). In consumer litigation such as the present case, a class action is the only possible way to litigate the claims. As evidenced by the fact that very few (if any) lawsuits have been filed against State Farm over the matters at issue here, the vast majority of State Farm policyholders either had no knowledge whatsoever that they were owed money or had little incentive or ability to litigate their claims. According to State Farm's own assessments, the losses due to policyholders would range from $0 to perhaps several hundred dollars. It would be difficult for class members to retain attorneys to pursue such small claims against State Farm. *See In re: Prudential*, 962 F. Supp. at 523. Thus, absent this class action and the settlement of same, many individuals may well have no remedy.

The special efficacy of the consumer class action has been noted by the courts and is applicable to this case:

> A class action permits a large group of claimants to have their claims adjudicated in a single lawsuit. This is particularly important where, as here, a large number of small and medium sized claimants may be involved. In light of the awesome costs of discovery and trial, many of them would not be able to secure relief if class certification were denied.

*In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 732 (N.D. Ill. 1977) (citations omitted); *see also Gunnells*, 348 F.3d at 424 (quoting Moore's Federal Practice § 23.02 (3d ed. 1999) ("[C]lass actions also 'afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions.'"); *see also Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628-29 (E.D. Pa. 1994).

This class action is simply the only sensible means of adjudicating this controversy. All of the Class Members will receive a statewide audit to determine whether they are owed a refund from State Farm. If they are, all of them will receive the full refund due, plus interest, and all of

their claims will be resolved, finally, in this one proceeding. That is the essence of efficiency. Plaintiffs submit that the Settlement Class proposed in the Settlement meets the requirements of Fed. R. Civ. P. 23, and should be certified by the Court.

**B.** **The Settlement Should Be Preliminarily Approved.**

In addition to finding that a class meets the requirements of Fed. R. Civ. P. 23, the Court must also find that the Settlement is "fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *see also* Fed. R. Civ. P. 23(e)(1)(C). In making these fairness determinations, the Court should be guided by the strong policy favoring settlement, as well as the realization that compromise is the essence of settlement. *In re Oil & Gas Litig.*, 967 F.2d at 493. Settlements of class actions are highly favored and should be upheld whenever possible, because such settlements are a means of amicably resolving disputes and preventing lawsuits. *Bennett v. Behring*, 96 F.R.D. 343, 348 (S.D.Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

The Court should not substitute its view of an ideal settlement for the compromising parties' views. "The evaluating Court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3rd Cir. 1995). Instead, the Court should examine the settlement cognitive of the overriding public policy in favor of settlements. *Cotton*, 559 F.2d at 1331. "Settlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process and are highly favored in the law." *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000).

Courts consider several factors to determine the fairness, reasonableness, and adequacy of a proposed settlement. These factors include:

- the posture of the case at the time settlement is proposed;

- the extent of discovery that has been conducted;

- the circumstances surrounding the negotiations;

- the experience of counsel in class action litigation;

- the relative strength of the plaintiff's case;

- the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial;

- the anticipated duration and expense of additional litigation;

- the solvency of the defendants and the likelihood of recovery on a litigated judgment; and

- the degree of opposition to the settlement.[11]

*In re: Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4ᵗʰ Cir. 1991); *see also In re: Domestic Airlines Antitrust Litig.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993). As discussed below, all of these factors weigh heavily in favor of approving the settlement before the Court.

　　1. <u>Posture of the Case.</u> The parties reached an agreement to settle this matter prior to notification of the class. Thus, Class Members will be afforded the right to choose to be included or excluded from this case based on the terms of the settlement. The posture of the case therefore favors preliminary approval. *See, e.g.*, *Horton v. Merrill, Lynch, Pierce, Fenner & Smith*, 855 F. Supp. 825, 829 (E.D.N.C. 1994) ("By reaching an agreement in principle prior to

---

[11]The substance and amount of objection or opposition to the settlement is not best applied at the preliminary approval stage, before notice has issued. In any event, there is no known opposition to the settlement at this time. State Farm's solvency is also not a relevant factor in this case.

notification of the potential class members, the members could choose to be included or excluded based on the terms of the proposed settlement…. Thus, the posture of the case at the time of the settlement favors final approval.").

2. <u>The Extent of Discovery Conducted.</u> This case has been developed through intense formal and informal discovery. Plaintiffs propounded written interrogatories and requests for production, and State Farm produced over 30,000 pages of documents. The parties have likewise engaged in significant informal discovery, both through the litigation process and as they have worked out the details of the Settlement Agreement. Confirmatory discovery regarding State Farm's business and underwriting practices and the terms of the Settlement has also been completed. The extent of discovery conducted weighs in favor of preliminary approval.

3. <u>Circumstances Surrounding the Negotiations and Experience of Class Counsel.</u> As set forth above, the negotiations resulting in the Settlement have taken place over more than four months. Numerous documents, settlement drafts, and settlement models have been exchanged. Over eight in-person meetings have occurred along with hundreds of conference calls and emails. The agreement ultimately reached between the parties calls for Class Members to receive 100% of any amounts by which they were overcharged, plus interest. This result was negotiated at arms length between experienced counsel for State Farm and the Plaintiffs.

As set forth in the Affidavit of Michael L. McGlamry attached hereto, Class Counsel have significant experience in class action litigation. They have the benefit of having conducted discovery and they know the strengths and weaknesses of this case. In light of the inherent risks of litigation, and the fact that Class Members will receive all amounts that are potentially due

them, the Settlement is an outstanding result for this case. Plaintiffs' Counsel endorse this Settlement and urge its approval.

4.  <u>The Relative Strength of the Plaintiffs' Case and State Farm's Defenses.</u>
Although Plaintiffs are confident in their legal theories, litigating this case to its end would have entailed great risk. To begin with, Plaintiffs would have been required to seek class certification over State Farm's objection. State Farm would have surely urged that individual issues as to damages would exist among class members such that class certification was inappropriate. At best, the outcome of the class certification issue was unclear. Even if the case was certified, Plaintiffs would have been required to provide notice to the Class at the expense of the Class, as opposed to State Farm paying the costs of notice and administration as it will do under the Settlement.

Likewise, there remained substantial questions as to whether Plaintiffs could establish liability at trial. Proving that Class Members have been overcharged is not the same as proving the amount by which they were overcharged. In order to do so, Plaintiffs would likely have been forced to purchase or develop the ISO Location® database or some similar database at a great expense. Even if Plaintiffs had the data to properly establish liability, State Farm might still have prevailed. State Farm believes it has several viable merits defenses, any one of which, in State Farm's view, would eliminate or substantially reduce any recovery for the putative class. In the meantime, both parties would incur additional expenses in preparing for and trying the case on the merits.

In light of these substantial obstacles to Plaintiffs' obtaining recovery, the Settlement provides significant and valuable relief to Class Members. Indeed, Class Members will quite

possibly receive more through the Settlement than they otherwise could have received had the case been litigated to its conclusion. That is far from the norm in class action litigation. *See*, *e.g.*, *Bennett*, 737 F.2d at 987 n.9 (recovery of 6 percent of upper limit of damages approved); *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-13 17, 2005 U.S. Dist. LEXIS 13992, at *38 (S.D. Fla. July 8, 2005) (recovery of 19 percent of upper range of damages approved); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 543 (S.D. Fla. 1988) (recovery of 3-5 percent of damages approved). The risks and uncertainties of continuing on in litigation weigh heavily in favor of the Settlement.

5.     <u>Continued Litigation Would be Expensive and Time Consuming.</u> Continued litigation would have consumed at least another year, and probably longer. If the Court had allowed the class to be certified, State Farm likely would have sought appellate review under Rule 23(f), thus postponing any trial for a significant time. Even if that Rule 23(f) appeal were denied, the case would still have to be set for trial, a trial conducted, and appeals exhausted, before Class Members would obtain any relief (if they ever obtained relief). In contrast, Class Members will get relief under the Settlement in a short period of time and the relief they will receive is the total amount due them, plus interest. The Settlement should be granted preliminary approval.

## C.     <u>The Proposed Notice is Adequate</u>

Finally, once preliminary approval of the settlement is granted, notice must be directed to the Class Members and the Court must approve the substance of the notice and the delivery thereof. For class actions certified under Rule 23(b)(3), including settlement classes like this one, "the court must direct to class members the best notice practicable under the circumstances,

including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In addition, Rule 23(e)(1) applies to any class settlement and requires the court to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Fed. R. Civ. P. 23(e)(1). When a court is presented with a tentative settlement class, the class-certification notice and notice of settlement is typically combined in the same notice. David F. Herr, *Annotated Manual for Complex Litigation* § 21.633 (4th ed. 2005) ("For economy, the notice under Rule 23(c)(2) and the Rule 23(e) notice are sometimes combined.").

The form, content, and proposed delivery of the class notice (the "Notice") in this case is reasonable and should be approved. As required by Rule 23(c)(2)(B), the Notice "concisely and clearly state[s] in plain, easily understood language" (1) the nature of the action; (2) the class definition; (3) the class claims, issues, and defenses; (4) that if a class member desires, he may enter an appearance through counsel; (5) that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and (6) the binding effect of a class judgment on class members under Rule 23(c)(3). Fed. R. Civ. P. 23(c)(2)(B). The Notice adequately informs Class Members of the nature of the case, describes the settlement terms, including the benefits available and the releases to be given, and explains that when the Court considers final approval at the Fairness Hearing, Class Members may be heard about the settlement. It informs objectors to file written objections with the Court and to give notice if they intend to appear at the Fairness Hearing. *See* David F. Herr, *Annotated Manual For Complex Litigation* § 21.633 (4th ed. 2005). It also apprises Class Members of Class Counsel's request for attorneys' fees. And it will be delivered to Class Members by U.S. mail,

which process has been confirmed by numerous courts to be reasonable and compliant with due process. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13, 105 S.Ct. 2965 (1985) ("We think the procedure followed by Kansas, where a fully descriptive notice is sent first-class mail to each class member with an explanation of the right to 'opt-out' satisfies due process."). The Notice should be approved by the Court.[12]

## CONCLUSION

As set forth above, the net effect of the Settlement is that all Eligible Claimants who were overcharged for their insurance premiums will receive 100% reimbursement, plus interest. By any measure, that is an extraordinary result for this case. The Settlement Class as proposed in the Settlement Agreement meets the requirements of Fed.R.Civ.P. 23. The Settlement is likewise fair, reasonable, and adequate, in light of the risks associated with continued litigation and the obstacles Class Members faced to class certification and recovery. Finally, the notice plan and the contents of the proposed notice constitute the best notice practicable to Class Members. Accordingly, Plaintiffs respectfully request that the Court **GRANT** preliminarily approval to the proposed Settlement subject to a final fairness hearing, **CERTIFY** the Settlement Class identified in the Settlement Agreement, and **ORDER** the parties to disseminate the Class Notice to the Class, consistent with the Proposed Order Granting Preliminary Approval to the Settlement submitted by the parties.

---

[12]Because this case is governed by the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1715, the notice program will also comply with federal law requiring notice to the attorney general or appropriate government official in every state in which a Class Member resides.

Dated:  June 23, 2010.

/s/Gary J. Rickner
Gary J. Rickner
N.C. State Bar I.D. No.:  025129
E-mail:  gjr@wardandsmith.com
Jenna Fruechtenicht Butler
N.C. State I.D. No.:  022719
E-mail:  jfb@wardandsmith.com
Hugh R. Overholt
N.C. State Bar I.D. No.:  016301
E-mail:  hro@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC  27636-3009
Telephone:  (919) 277-9100
Facsimile:  (919) 277-9177

C. Neal Pope, Esq.
Michael L. McGlamry, Esq.
Pope, McGlamry, Kilpatrick,
Morrison & Norwood, LLP
3455 Peachtree Road, N.E.
The Pinnacle, Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, Georgia 30326-3243
Tel: (404) 523-7706
Fax: (404) 524-1648

Wade H. Tomlinson, III, Esq.
Alan G. Snipes, Esq.
Amelia A. Godfrey, Esq.
Pope, McGlamry, Kilpatrick,
Morrison & Norwood, LLP
1111 Bay Avenue, Suite 450
P.O. Box 2128 (31902-2128)
Columbus, Georgia 31901-2412
Tel: (706) 324-0050
Fax: (706) 327-1536

*Attorneys for Plaintiffs*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2010, I electronically filed the foregoing PLAINTIFFS'

MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF

CLASS ACTION SETTLEMENT with the Clerk of Court using the CM/ECF system which will

send notification of such filing to the following: Scott Lewis, Ellen J. Persechini, Todd A.

Noteboom, and Monica L. Davies.

/s/Gary J. Rickner
N.C. State Bar I.D. No.:  025129
E-mail:  gjr@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC  27636-3009
Telephone:  (919) 277-9100
Facsimile:  (919) 277-9177